Your Honors, my name is Stephen Kang, and I'm counsel for petitioners. I'd like to request four minutes of time for rebuttal. Sure, thank you. So I represent Patricia Hernandez-Garland and her son, who I'll refer to here as Emmy. And so we're here because the agency denied the motions to reopen the inessential orders of petitioners. Despite undisputed evidence that Ms. Hernandez-Garland has a serious disability dating back to her childhood, that this disability, in her own words, causes her problems in all areas of her life, and that these problems are directly connected to why she didn't appear at the July 2016 hearing where she was ordered removed. In addition, Emmy was only four years old at the time he was ordered removed. There should be no serious dispute that a four-year-old child has no ability to get himself to court on his own and should not be held responsible under the due process clause for his failure to appear. In addition, Emmy was actually expressly excused from showing up at the very hearing where he was ordered removed, and it must be true that you cannot tell someone that they don't have an obligation and then penalize them for not fulfilling that obligation. All of this was error. The court should reverse on these grounds and remand for reopening of both petitioners' removal proceedings. May I ask you a question about the status of Emmy? Do we consider Emmy's petition separately, given that the agency treated his petition as dependent on his mother's? So, how do we treat them separately? You know, they were referred to the mother as the lead petitioner, and if she got relief, then Emmy would get relief. If she didn't get relief, then Emmy wouldn't get relief. Is that how it works? I think the first half of what Your Honor just said is correct, but not the second. So, the way the case is set up, the agency's only basis for upholding the removal orders of both Emmy and his mother was its view of the mother's situation, and it's a view that she did not meet the relevant legal standards. If this court disagrees with that conclusion, then the whole case would go back because there's no other basis for upholding Emmy's removal order. But, should this court look at Ms. Hernandez-Gillan's claims and affirm the removal order as to her, it should go on to address Emmy's independent claims because he has raised independent arguments for reopening of his proceedings that stand apart from his mother. One further wrinkle on that, though, because what I understand you're asking with respect to the mother is for a remand for the agency to consider whether there was an issue of competency under MAM, and then to hold some sort of a hearing or get support on that, but if we were to do that, what happens to Emmy? That's an important wrinkle, Your Honor. I think just to be clear, we think Ms. Hernandez-Gillan has raised two separate claims. The first is the MAM competency claim, and the second is her exceptional circumstances claim. I think the court does have authority under both of those claims to simply direct reopening of her full proceedings rather than simply reconsideration of the evidence. But if this court orders the more limited remedy of remanding simply for full consideration of the record, then it seems even more important to go on to address Emmy's separate claims for reopening because, once again, he's raised independent arguments and defenses with respect to his removal. But is the implication of your argument that when you have an accompanying minor, and the parent doesn't appear, then the child can never be removed because the child is never going to be competent? Your Honor, I think what the court could say is simply that this child's removal order was unlawful because she was for you. I'm trying to figure out what we're saying, and our assumption, I mean, I think you effectively refuted the government's notion that he was derivative because he was derivative as to the relief, but as to removal, I don't think he's officially derivative, but he's as a practical matter derivative. He's always been treated as derivative. The question is whether there is any statutory or other basis, or is it simply a mother-child relationship that makes him her essentially his guardian for purposes of the removal proceedings? Or is there some formal way in which she is the guardian for the purpose of the removal proceedings? Certainly, the assumption is that she is, but I don't know where that would come from. It may be right, but I'd like to know that. And if it's not right, then don't you end up with a situation where a child, at least a young child, can never be independently deported, removed? Well, Your Honor, I think there's... In absentia, or maybe even not in absentia. I think, to be clear, we're dealing with in absentia orders here, so I think a child who actually shows up to court would be a different question. But as to children who don't show up to court, I think there's three salient considerations from this particular case that are relevant to pull out. I think the first consideration the court should look at is his young age, which by itself here may be dispositive. Because whatever his parents' responsibility or lack thereof for not appearing, there can be no question that Emmy was not making any deliberate choice not to appear. He simply had... What I'm asking you is, in what sense is the parent responsible for the child? And where does that responsibility come from? I understand he can't make any decisions. If he was an unaccompanied child, it would be a different story. But he's there... He was given an NTA. He came with his mother. He was given an NTA with his mother. The agency has been treating her as essentially responsible for him. Is she responsible for him? If not, why not? She is. Well, Your Honor, I think she is responsible for him in the sense that, obviously, she is his parent. And we don't dispute and have no quarrel with the notion that a parent has important custodial rights and responsibilities with respect to their child and can, in some circumstances, help make decisions for that child. We don't dispute that at all. But if we're talking about protecting Ms. Hernandez-Galan's parental interests and recognizing her authority over her child, her stated wishes in this proceeding are clear. She wants the removal order against her child vacated. We're all here, at least as counsel, vigorously disputing the lawfulness of ME's removal order. And so, with respect to that, her interests are actually clear. And what the government is trying to do is say, despite what you want, Ms. Hernandez-Galan, despite what might be in the best interests of ME, we want to impose the permanent penalties of a removal order, not just on you, Ms. Hernandez-Galan, but also your son. Your son, who was four years old at the time he was ordered removed, will now bear the permanent immigration and potentially criminal consequences of this removal order. And I think the government would be hard-pressed to identify a situation where this really occurs on a regular basis. Well, I'm trying to wonder, Mr. Payne, under what circumstances, if the child's right is not derivative and tied to the parent but has independent rights, under what circumstances could the BIA ever conduct a removal hearing and deport a child? I mean, they're incompetent by definition by minority age. And especially at this age, they can't speak. So I don't understand how it works. It seems like your argument – I'm not sure what the bounds of your argument are. When you look at the independent, non-derivative rights of the child, under what circumstances could that child be lawfully deported unless it's tied to some kind of de facto guardian ad litem or some kind of relationship where the child's rights are tied to what the parent does or doesn't do in hearings? Right, Your Honor. I think this actually goes to the beginning of one of my answers to Judge Berzon's question. I think the three most salient considerations to pull out of Emmy's specific case are, first of all, his age, which could be dispositive. He is quite young, which by itself raises serious questions as to whether he can be held responsible for not showing up to court. The second is representation status, whether he was pro se or not. And the third is whether there's any record evidence going to his ability as a child to show up to court. Now, applying those three factors here, it seems clear that Emmy cannot be held responsible for his failure to appear in removal proceedings when he was entirely dependent on adults to help him get there. And there may be other factors that the court consider on a case-by-case basis and other circumstances that may arise. But to us, those are the three most salient considerations the court should be looking at. Your Honor, what about the fact that he was excused from appearing? I'm sorry. I'm sorry. I didn't quite catch that question. I'm sorry. I know. Okay. I'm sorry. This Zoom thing today is particularly not good. You said three salient factors. What's glaring to me is there's a fourth, that he was, that I.J. said, you don't have to appear. Right, Your Honor. And that goes to a separate argument that we're raising, apart from this notion that Emmy as a young child simply should not be held responsible for his failure to appear. In Emmy's specific case, he also has the separate claim that the immigration judge expressly excused his year of appearance at the July 2016 hearing. And that is an independent due process violation. Was that excusal on the assumption that the mother would represent him? That is, he need not appear because his interests are going to be represented by his mother. There's nothing in the record that suggests that the excusal was conditioned on his mother's failure, on his mother's appearance. All we have from the record is a brief post hoc description from the immigration judge in one of the orders merely stating that she had excused Emmy's appearance. And we don't have contemporaneous transcripts, so we don't know exactly what the immigration judge said. And so, again, there's no evidence in the record showing that Emmy's excusal was conditioned in some way on his mother's appearance at all. Are you going to address at all the Pereira question?  It seems to me that there was a case argued in the Supreme Court in the fall. And we really couldn't decide. And your case does seem different than carrying the fee and such and such because you're relying on the statute. But whether a two-stage notice is allowed is exactly what the Supreme Court is supposed to decide. So don't we have to wait for that? Yeah, that would be our recommendation, Your Honor. Like, to the extent the court wants to address the Pereira issues at all, it seems more appropriate to wait until the resolution of Ms. Chavez and Lorenzo Lopez, which is the en banc case before this court that has basically— How could we not address it? If it were correct, it would be logically prior to all your other arguments, wouldn't it? Yeah, that's correct, Your Honor. I think Ms. Chavez, at the minimum, will be dispositive or—at a maximum, will be dispositive. At the minimum, will provide a lot of important guidance. Can we address the exceptional circumstances for the motion to reopen without getting into the Pereira issues? That is correct, Your Honor. The three sets of claims we've raised here are Ms. Hernandez-Golan's claims, ME's separate claims for reopening, and the Pereira claims. And the first two categories can be addressed without touching the Pereira-related issues at all. So can I ask you about the exceptional circumstances? One of the factors that the courts have looked to is sort of this unconscious—unconscionable result where somebody clearly would have obtained relief but for the failure to appear or whatever happened. And in her case, her claims for asylum or for cat relief seem pretty weak. I mean she—this is different from Singh. I mean, can you show me what the strongest argument is that she has a strong equitable claim here? Your Honor, as our brief opening brief explains, her claims for asylum are actually quite strong. And this goes to stuff that's something that's outside the record, but we have—there's been changed circumstances in her and her family's situation back in November. And I'm wondering, can we take that—is that something we can take into account? This is new information that wasn't before the BIA, right? It is true, Your Honor, but to the extent the court has—we think all the considerations, to be clear, in Ms. Hernandez-Golan's case, not just her relief eligibility, go to her meeting the exceptional circumstances standard. But to the extent the court has concerns about the quality of her relief claims, we just wanted to offer that to note that we in fact think both her and her son's claims are quite strong. I see I'm about to close to time. May I reserve the remainder of the morning? Yes, you may, counsel. Thank you. Good afternoon, Your Honors. May I please the court? Linda Chang on behalf of the acting U.S. Attorney General, Robert Wilkinson. I'd like to start by addressing the court's concern with the accompanied minor issue in this case. It is true that Emmy was accompanied by his parents, and his mother was the primary applicant for the asylum application. And in the box on the application, she checked that he would be the derivative riding on her application. That's at page 85. That's not what we have there now. We have a removal in absentia. Correct. Yes. I'm sorry. So if we look at the in absentia order, it states that the petitioner's failure to appear and proceed with any application for relief constitutes an abandonment of any pending application and any applications that she may be eligible to file. Now, because Emmy's relief is tied to his mother's application, her failure to appear in court as notified in the notice of hearing rendered her removable. And consequently, she had also abandoned any application or any eligibility for relief in the future. To the extent that petitioner alleges that Emmy has his own claim, he has never filed a separate asylum application on that front. And therefore, that doesn't explain how he was removed in absentia. He was removed without, is what you're saying was, so he would have been removed even if it wasn't in absentia because he wouldn't have had any relief that he could have applied for by himself? Is that what you're saying? That is correct. That is how the derivative beneficiary status works. So if his mother had gone to her hearing and completed the full proceedings, but nonetheless was order removed, the same outcome would befall him. The two outcomes are tied together unless there is a separate and independent application. But he was removed in absentia. He wasn't denied asylum in absentia. So the question of whether he can be removed when he was told he didn't have to come, among other things, is a separate question from what would have happened had the asylum relief. In other words, the way I can put your argument together would be something like, well, without the asylum application, he couldn't have been prejudiced in any way by the in absentia removal because he would have been removed without the asylum application for people who were there. Is that what you're saying? So to the extent that he is alleging that his mother's in absentia order should not apply to him, he does not posit any case where such separation is supported where he does not have a separate asylum application pending. This would leave the accompanied minor without any recourse if he doesn't file it. Let's say, for example, that he had some personal, I don't know what it would be, but that whatever the ground for removal is doesn't apply to him. No, here it probably does because he came across the border with his mother, but the mere fact that he's appearing with his mother doesn't mean he doesn't have any independent defense to deportation. From what we see in the record and how derivative beneficiary status works, the two are tied together in relief and in removal because if she had received a grant of asylum, he would have also received the grant and therefore not have been removed. So the positive consequence would flow to him as well as the negative consequence as a derivative beneficiary. Counsel, let me ask you hypothetically just to follow up on that. Suppose his father took him to the hearing on the day that he was excused from attending the hearing, but his mother didn't show up. What would have happened? So under that hypothetical, which was not the situation here, we understand that. That's why we called it a hypothetical. It's unclear what his purpose in appearing in immigration court would be for that day. If he is not there to advance his own relief from removal or present testimony in support of his mother's application. He certainly couldn't be removed in absentia under those circumstances. He wasn't in absentia. Correct. However, in this case, his in absentia order was tied to his mother's. Why is the in absentia order tied to his mother? We understand why the asylum is tied to his mother. Because as a derivative beneficiary, relief and removal both flow from the same application. So to the extent that if she was granted asylum, he would also be granted asylum and he would not be removable. Is there a process, Ms. Chang, where a minor would have a guardian ad litem formally appointed as would happen in court? What happens before an immigration proceedings? So there are certain safeguards for unaccompanied minors. And that is a possibility. However, that was not necessary in this case because Emi's mother stated that in the I-213s in the record, we see that she stated that she will be answering and signing all and any questions and documents pertaining to her child's side A file. So therefore, she has already taken up the responsibility as the parent, as the guardian for this child. The child is not unaccompanied like the case law petitioner cites for J.E.F.M. and that body of law. Can we talk about sexual circumstances issue for a while, please? Why are there sexual circumstances? We have various cases, including a recent unpublished case, but also others in which the fact that people were misled as to the date. And here you have somebody who has explained very specifically why she was misled, how she was misled. She shows up two weeks later. She tries to reopen it. Why isn't this? And she has reasons that relate to her inability to read and also to her mental state or cognition. Why isn't that a sexual circumstance? So the sexual circumstances are considered in the totality by the immigration judge and here petitioner appears to want the court to reweigh the evidence, which it cannot do in looking at the evidence that petitioner presented in her motion to reopen. She does allege all those things that your honor has stated. However, these only amount to a mistake in knowing when to show up to the extent that she now alleges a competency issue. It was never exhausted to the agency. Competency is a very. I'm not talking about the competency in the end, but it was exhausted with regard to the sexual circumstance. Very specific that she had this memory problem that where it came from. All that the agency said about that was it wasn't cooperated. Why does it have to cooperate? She had it in a sworn declaration. She did have that. So to the extent that she argues that she is incompetent based on her own self-serving declaration. I'm not saying competence. She has memory, cognition issues and can't read. Those were very specific. So based on those two specific reasons, the immigration judge and board determined that it was not sufficient to support a finding of exceptional circumstances. The lead respondent was not certain she could have called the automated system, but she could only do that if she could read the document and told her that she could call the automated system. So why isn't that just per se nonsensical? It isn't per se nonsensical in the sense that petitioner, even though she could not read, was able to find family members who could read the notice of hearing to her, albeit they transposed the numbers, which was a mistake. However, she was able to find a way around her inability to read and she did not make this assertion to the immigration judge. They didn't think there was a mistake. Why should she check it? It was nothing for them to tell the people who were reading it weren't going to tell her to check anything because they thought they were reading it right. And they had a reason for thinking that. That's true. And that is a situation here. However, what she needs to show is exceptional circumstances to rescind this motion, which she has not shown. Well, on top of her memory problems, her inability to read, which required her to depend on her family. And then when she depended on the family because of the cultural difference or the linguistic difference, they misread the date transposed it, which was perfectly understandable. On top of that, she had shown that she made every effort to comply. She came to every hearing before that. She had no reason not to come. And so she exercised the kind of diligence you would expect. She wasn't trying to evade anything. Why doesn't all that add up to exceptional circumstance? When you step back, it just seems unfair. I understand Your Honor's concern. And the board was sympathetic to her situation. However, exceptional circumstances are clearly defined under the statute as referring to such things as battery or extreme cruelty to an alien or any child. OK, but we have Lowe versus Ashcroft, for example, where it was found to be exceptional circumstances because the paralegal gave her the wrong information about the date. Don't worry about it because the hearing is not until Monday, the 24th. So that is pretty similar. And then we have the Fiyardo versus Ines, where she was an exceptional circumstance because the paralegal failed to inform the petitioner of the need to attend the hearing. And then we have a recent Mendisco, Duran versus Gonzales, which is basically the same, a very similar situation. In that instance, she didn't have the reading problem herself. So it's not like there isn't precedent for this. I see what you're saying, Your Honor. However, there are also cases that go the other way. So in Herrera-Barrera versus Gonzales in an unpublished case in this court. OK, but these are all grants, right? So we're disagreeing with the IJ and BIA in every one of those instances. Sorry? We were disagreeing. In other words, we weren't deferring to the IJ and the BIA in the three cases I just gave. We simply said the determination that this was not an abuse of discretion, that it was not an exceptional circumstance, was an abuse of discretion. Right? Right. So why shouldn't we do the same here? Because in this case, it doesn't necessitate that kind of outcome where a petitioner is merely asking the court to reweigh the evidence, which it should not do. Again, the standard of review, as you have stated, is abuse of discretion. And based on the decisions in this case, it does not appear that the IJ or the board issued a decision that was arbitrary or capricious. It examined the totality of the evidence. And although it was unfortunate, they determined that petitioners did not show exceptional circumstances in this case. All right. Can we go briefly, because your time is up, to the Pereira issue? Do you agree that we can't decide that issue, that we need to decide it until a Supreme Court decides it is shabbos? No, Your Honor. I do not believe that we need to wait for the Supreme Court's decision and its shabbos or the Lopez decision that has been stayed pending that case, because the issues in this case can be cited now. To the extent that petitioner has formulated an argument questioning the in absentia statute, this is different from what they presented to the board in their brief. Therefore, it has not been exhausted. The board did not have a chance to pass on the interpretation of the statute in the first instance. And therefore, the court should not have jurisdiction over it to review it in the first instance. But I looked at that document, and it largely is talking about deregulation, but there is a whole paragraph that talks about the specifics of the statute. That would seem to be good enough for exhaustion. To the extent that Your Honor presumes that this argument has been exhausted, we can look to the plain language in this in absentia statute, and we see that in 8 U.S.C. 1229 AB 5A, the written notice requirement is satisfied under 8 U.S.C. 1229 A1 or under A2. So, in this case, we see that service has been satisfied through A2. There is no reason to question the in absentia order itself, as there is a wide body of law within this court and other circuits that satisfactory notice, as well as removability, once established by DHS, is sufficient for an in absentia order once petitioner fails to appear. Well, you run into the argument, which gets us into the merits and interpretation of Ferrerum, that A2 doesn't apply because that presumes that there was a valid FTA in the first place. And notice with the NTA in the first place, because it talks about a change. So, if we go down that path of arguments, we then are back into the realm of arguing for jurisdiction and whether the NTA itself was sufficient or whether the two-step process is enough to cure a deficient NTA. And all of that has been cited by Karen Gateby already, because this is also not... Well, that was a situation where the only jurisdictional basis was the regulation. And the regulation doesn't say that. The regulation is forgiving. It says something as far as possible or something to that effect. And it deals with jurisdiction in the ordinary course. But this is a specific statute that pertains to the in absentia orders, and it does specify in the statute the necessity of having an NTA that is an NTA. Which Ferrerum says is that that's the question, is whether that would, for the court in Nies-Chavez, is a two-stage order notice, an NTA under those circumstances. So, I don't see how we... And it could be that if the court in Nies-Chavez decides that a two-stage notice is okay, then it seems to me Nies-Fernandez loses. But if it says it isn't okay, then I think its reasoning and so on is going to be awfully pertinent to this. I understand it's a discrete statutory question, but it's a statutory question. It's not the regulation. And it's not Karen Gateby. So, why don't we have to wait? So, if I understand what you're saying, Your Honor, petitioner argument tries to distance itself from the regulations for jurisdiction that were discussed in Karen Gateby. Well, there would be no other impact except for jurisdictional purposes. All right. Counselor, you're well over your time. We're going to have to consider that. I believe your opposing counsel has a few minutes left, and you may proceed, Mr. Kang. Thank you, Your Honor. Just a few brief notes. I think the first thing to note is that this court could grant the petitions for review here without addressing the Pereira issues at all, like the other claims that we've raised for both Ms. Hernandez-Gallant and her son arise independently and don't depend on the Pereira issues specifically. Going to Judge Berzon's questions concerning the derivative nature, allegedly, of Emmy's claims, the board has actually said that a noncitizen seeking to rescind an inobstantial order did not show prejudice. And this court has affirmed that rule in Loewy-Ashcroft, which is one of the cases Judge Berzon was discussing. So, Emmy does not have to show what would have happened at the end of his case in order to get his inobstantial order reopened. And that makes sense, too, because what happened here is very common. Emmy and his mother were ordered removed at what's called a master calendar hearing, which is basically a short status conference that can take five minutes. They hadn't even gotten to the relief stage of the case, and there's no evidence in the records showing that they had even articulated their positions on relief yet. And so ex ante, the immigration judge could not have known whether Emmy's claims would be derivative or not because they just simply hadn't gotten to it. And I think going to some of Judge Chen's questions concerning the scope of this rule, I do want to note that there are other options available to the agency other than cutting straight to an inobstantial order. For example, the agency could have directed personal service on the mother and the child. And by personal service, I mean actually physically bringing the notices to a peer and hearing notices to them rather than simply directing their removal. And I see I'm out of time, so unless the court has other questions, I will submit. All right. Thank you, Counsel. Hernandez-Garland v. Wilkinson is submitted, and this court will be in a 10-minute recess.
judges: Wardlaw, Berzon, Chen